**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

_____

NANCY BROWN, Individually and as
Special Administrator for the Estate of
JOHN BROWN, Deceased,

        Plaintiff,                        Case No. 13-CV-511

v.                                    Honorable Lynn Adelman

WAYNE BLANCHARD, in his individual capacity,
CHRISTOPHER SUCH, in his individual capacity,
and WALWORTH COUNTY, WISCONSIN,

        Defendants.

_____

### PLAINTIFF NANCY BROWN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, NANCY BROWN, Individually and as Special Administrator for the Estate of JOHN BROWN, Deceased, submits this Memorandum in Opposition to Defendants' Motion for Summary Judgment.

### INTRODUCTION

This case involves the tragic death of John Brown, a mentally-ill twenty-two year old who was unnecessarily killed by Deputies Wayne Blanchard and Christopher Such in the early morning of May 5, 2012. On the night of the shooting, John Brown had locked himself in his bedroom and was attempting to commit suicide by cutting his own wrists. When his mother, Nancy Brown, heard from a friend that her son was attempting to commit suicide, she called 9-1-1 with the hope that the police could save her son. The police dispatcher told Ms. Brown a "rescue squad" and officers were on their way to help. However, instead of attempting a rescue,

Deputies Blanchard and Such did the opposite. Treating John as a criminal, Deputies Blanchard and Such hastily kicked in John's door and shot him twice within a few minutes after arriving at his residence.

Plaintiff, Ms. Brown, filed a three-count civil action under 42 U.S.C. § 1983 against Deputies Blanchard and Such and Walworth County, alleging that her son's Fourth and Fourteenth Amendment rights were violated. In response, Defendants filed a motion for summary judgment on all counts. Defendants' Motion must be denied for the following reasons.

First, Deputies Blanchard and Such's use of deadly force was unreasonable considering the totality of the circumstances and in violation of the Fourth Amendment. Second, Deputies Blanchard and Such are not entitled to qualified immunity. Third, although Deputy Such did not pull the trigger that killed John, he is not absolved of all constitutional liability because he stood by and failed to intervene when he had the opportunity to prevent Deputy Blanchard from using excessive force. Fourth, Walworth County's custom and policies for interacting with emotionally disturbed persons ("EDPs") are unconstitutional. Deputies Blanchard and Such's actions were directly contrary to well-established procedures – both in Wisconsin and nationally – for how police officers should interact with EDPs. The Deputies' grossly reckless behavior, and the failures of command and control that permitted it, followed from the lack of police policies and procedures regarding how to handle EDPs, inadequate EDP training, or both. This amounted to an unofficial custom or policy within the Walworth County Sheriff's Department of deliberate indifference to the rights of EDPs, as demonstrated by the Department's approval and ratification of the Deputies' actions. Accordingly, as fully set forth below, Defendants' Motion for Summary Judgment must be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff incorporates the facts contained in its attached Rule 56.1(b)(3)(A)-(C) Statement of Facts ("Facts").

### a. Events Giving Rise to 9-1-1 Call

John Brown was a bi-polar twenty-two year old who struggled with depression. (Facts 92.) On the evening of May 4, 2012, John was locked inside his bedroom at his mobile home. (Facts 2.) He lived with his mother, Nancy Brown. (Facts 7.)

On that night, John Brown was feeling particularly depressed and began drinking heavily. (Facts 3-4, 98.) He made a few telephone calls to his friends and left voicemails saying he would be "looking down" from heaven soon and "I just want it to be done, please tell everyone I love them . . . ." (Facts 99.) With another friend, John Brown exchanged similar messages via text and Facebook, stating in one: "I love you . . . I won't be able to tell you tomorrow." (Facts 100.)

John called a family friend, Mindy Hamm, and told her he was cutting himself. (Facts 6.) After speaking with John Brown, Mindy called his mother around midnight, who was sleeping at the time, and informed her that John was in his bedroom hurting himself. (Facts 9.) Ms. Brown hung up and immediately rushed to John Brown's bedroom. (Facts 10.) The bedroom door was locked so she went into the kitchen and got the key. (Facts 11.) Ms. Brown rushed back to the bedroom, unlocked and opened the door, and saw John sitting at his computer playing sad songs. (Facts 12, 102.) John was holding a knife and he had already had multiple cuts on his wrist. (Facts 13.)

When Ms. Brown asked John Brown to give her the knife, he remained seated, "didn't say anything," and held the knife with his palm facing downward on the table. (Facts 103.) John Brown was crying. (Facts 105.) Ms. Brown "held his head in [her] arms and told him [she] was

3

going for help." (Facts 106.) Ms. Brown then told John that she was going to call the police and he responded, "okay, mom." (Facts 107.) After Ms. Brown left the bedroom, John Brown closed the door and locked it again. (Facts 108.)

### b. Ms. Brown's 9-1-1 Call Revealed that John Brown Was an EDP

At approximately 12:03 a.m., Ms. Brown called 9-1-1 and told the Walworth County dispatcher her son was cutting his own wrists with a knife and trying to commit suicide. (Facts 109.) The dispatcher responded that she got the "rescue squad" and officers were on their way. (Facts 110.) During the conversation, Ms. Brown told the dispatcher: (1) John was by himself in his bedroom and he likely had no other weapons except the knife; (2) there was nobody else inside the house (for the exception of Nancy and John); (3) John has cut himself before and was cutting himself "over some girl and life and everything"; and (4) John was bi-polar and "won't take any meds for it." (Facts 111-18.) The police dispatcher relayed all of this information to Deputies Blanchard and Such before they arrived. (Facts 111-18.)

### c. Walworth County Deputies Arrive at the Brown Residence and Within Five Minutes John Brown is Shot in the Neck

Deputy Such arrived at the Brown residence at approximately 12:11 a.m. (Facts 119.) Deputy Such knew John Brown from a prior incident; he did a favor for John one night by driving him into Burlington from his house. (Facts 120.) On that night, Deputy Such told Ms. Brown that John was a polite young man. (Facts 121.)

Deputy Blanchard arrived at the Brown residence about three to four minutes after Deputy Such, at approximately 12:14 a.m. (Facts 106.) Ms. Brown offered Deputy Blanchard the keys to John's bedroom. (Facts 122.) He responded that he did not need the keys because he was "just going to kick down the door." (Facts 37, 124.) Deputy Blanchard removed his gun from its holster and walked down the hallway to John Brown's bedroom door. (Facts 31.)

4

Meanwhile, Deputy Such went outside to see if he could see in a window and provide information to Deputy Blanchard about John's location and actions. (Facts 35-36.) Deputy Such had a good visual of John Brown and radioed that he could see John with his back to the locked door drinking a beer and smoking a cigarette. (Facts 36.)

### i. Deputy Blanchard kicked John's bedroom door open

Ms. Brown then saw and heard Deputy Blanchard pound on the door and heard him tell John Brown to come out. (Facts 40.) She heard John respond, "no, go away." (Facts 106.) Deputy Blanchard kicked Mr. Brown's bedroom door open and then took a step back and positioned himself in the hallway. (Facts 40.) At that time, Deputy Such saw John's bedroom door open. (Facts 45.) With the bedroom door open, the Deputies were able to see John Brown sitting on a chair by a desk facing a window, with his back facing the deputies. (Facts 46.) The Deputies could see that John was still smoking a cigarette and there was blood on his left arm. (Facts 46, 53.) He was also still holding the knife in his right hand. (Facts 55.)

There is some discrepancy regarding what was said to John Brown at this point. (Facts 40.) John Brown did not threaten the Deputies, or say anything to them for that matter. (Facts 43-57.) He just got up, stepped toward the bedroom door and closed it with his left hand. (Facts 57.)

### ii. Deputy Blanchard kicked John's bedroom door open a second time

After John's bedroom door was closed, there is some discrepancy as to what was said when and how shortly after John's door was kicked in. (Facts 43-63.) Ms. Brown heard Deputy Blanchard say he was going to kick down the door, heard John Brown say something like "fine, come in and shoot me between the eyes" while the door was still closed. (Facts 40.) She then heard the door being kicked in, slammed again, kicked in again, and then heard the two gun shots

"directly after that." (Facts 40.)   Ms. Brown was able to hear what John Brown and the

Deputies were saying "loud and clear" while she was sitting in the living room.  (Facts 40.)  She

only heard one of the deputies call John's name twice and did not hear either officer talk about

the knife.  (Facts 40.)  John Brown was shot in the neck at about 12:16 a.m.  (Facts 126.)

### d. Deputies Blanchard and Such Did Not Follow Proper Policies and Procedures on How To Handle Emotionally-Disturbed and/or Suicidal Persons

On the date of the incident, the Walworth County Sheriff's Department used policies and

procedures it adopted from the Wisconsin Department of Justice ("DOJ")'s Law Enforcement

Standards and Training Board.  (Facts 127.)  The Wisconsin DOJ has provided several training

guides for law enforcement agencies, departments and officers across the state on how to handle

EDPs, which includes suicidal, drunk and bipolar people.  (Facts 128-30.)  The Wisconsin DOJ

Crisis Management Training Guide states that: "[p]eople who undergo chronic crisis situations

are usually candidates for a mental health system response *rather than a criminal justice system

response*" (emphasis added).  (Facts 131.)  Police officers need to use different responses for

EDPs in part because "when a person is in a full crisis . . . phase, the ability to listen and

comprehend and focus may be as little as 5% of normal." (Facts 132.)  When dealing with EDPs,

it is important for police officers to stay calm, and "[b]efore rushing into a situation, take time, if

possible, to look it over and try to determine what is really going on with the subject."  One of

the key DAAT concepts is that "an officer always has the option to disengage" from a situation

"temporarily or permanently (is appropriate)." (Facts 134.)   In addition to being an "important

element of officer safety," disengaging can also help an officer achieve his goals and maintain

control of the situation. (Facts 135.)

The Wisconsin DOJ's Crisis Management Training Guide provides the following

guidance on how police officers should handle armed EDPs threatening suicide:

6

> If the person is simply armed and refusing to drop the weapon, but has not actually threatened anyone with it, the proper response depends on the circumstances. As an officer, you always have the options to disengage . . . [i]n some cases, temporary disengagement may be the appropriate response. For example, if the subject is alone and there are no other people in the vicinity that he or she can harm, it might be appropriate to disengage . . .

> If a subject is apparently alone . . . the tactical response decision may be different. Some law enforcement agencies have adopted a "hands off" policy in such cases. They choose not to respond so as to avoid forcing a possible deadly force "suicide by cop" situation . . .

> Many law enforcement agencies throughout the country are using "less-than-lethal" weapons, such as the Taser® or other devices which stun or shock a subject but are not likely to result in death of the subject. Such devices are used increasingly in situations where firearms might have been used in the past . . . Needless to say, this is good because it is a way to avoid using deadly force when avoiding such use is feasible . . .

> Remember that deadly force is a last resort to stop a threat, and is *only* to be employed when use of lesser force options has been precluded.

(Facts 136.) The Wisconsin DOJ Training Guide also provides that because "it is very likely [police officers] will encounter and respond to people with some form of serious and persistent mental illness," such a bipolar disorder, it is essential for police departments to have policies and procedures on how to handle EDPs. (Facts 137.)

### e. Deputy Such had a "proactive responsibility" to intervene

The Wisconsin DOJ's law enforcement training manual states: If one officer at a scene is dealing with an EDP "inappropriately or is somehow not handling the situation effectively, then the cover officer (officer observing to ensure that all goes well) has the *proactive responsibility* to intervene and to override the contact officer" (emphasis added). (Facts 138.) "This concept is a corollary to the concept of shared responsibility by law enforcement officers during contracts with suspects." (Facts 139.) While the concepts of "contact officer override" and "proactive responsibility" are important in general, they are "particularly important in regard to contacts

7

with people who are or may be in crisis." (Facts 140.) Under the Wisconsin DOJ's training standards and procedures, Deputy Such was in a "contact officer override" position right before Mr. Brown's door was kicked in and Mr. Brown was shot. (Facts 141.)

### f. Plaintiff's expert's findings and conclusions

Plaintiff's use of force expert, Dr. Geoffrey Alpert, did a detailed review of the available evidence and concluded that there is an apparent discrepancy between the versions of the events between the deputies and Nancy Brown. (Facts 143.) He also concluded that: "Deputy Blanchard did not make a serious effort to communicate with John. (Facts 143.) Deputy Blanchard was aware that John had mentally challenges and was self-injurious. (Facts 143.) He shouted at John through the door rather than attempt to talk with him in a calm manner." (Facts 143.) Had proper procedures on how to handle EDPs been followed, "the death of John Brown could have been avoided. (Facts 143.) Among other things, Dr. Alpert also opines that there were less-lethal alternatives to deadly force available to the Deputies. (Facts 143.)

## LEGAL STANDARD

### A. Summary Judgment in Excessive Force Cases are Disfavored

Summary judgment is appropriate only when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether a genuine issue of fact exists, the Court must construe all facts in the light most favorable of the party opposing the motion. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999). The Court must also draw all reasonable inferences and resolve all disputed facts in favor of the non-moving party. *Payne v. Pauley,* 337 F.3d 767, 776, 778 (7th Cir. 2003) (reversing summary judgment in false arrest and excessive force case because district court credited the version of facts offered by police officers over those offered by plaintiff). As

8

the Seventh Circuit has made clear, summary judgment in excessive force cases should be granted sparingly. *Abdullah v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005).

### B.  Elements for Section 1983 Claims

To establish a violation of Section 1983, Ms. Brown must show that Defendants deprived her son of a federal constitutional right while acting under the color of state law.  *Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996) (*citing* 42 U.S.C. § 1983).  Here, it is undisputed that Defendants were acting under the color of state law when they shot and killed Mr. Brown.  Moreover, as set forth below, Defendants also deprived John of his federal constitutional rights under the Fourth and Fourteenth Amendments.

## ARGUMENT

### I.  DEFENDANTS USED EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT WHEN THEY SHOT AND KILLED MR. BROWN

Deputies Blanchard and Such used excessive force in violation of the Fourth Amendment when they shot and killed Mr. Brown.  The Fourth Amendment protects people against "unreasonable searches and seizures."  U.S. Const. Amend. IV.   To establish a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable.  *Brower v. County of Inyo,* 489 U.S. 593, 599 (1989).  When John was fatally shot, he was "seized" within the meaning of the Fourth Amendment.  *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  The issue is whether Defendants' use of deadly force was objectively reasonable under the circumstances.

### A.  Deputies Blanchard and Such's Use of Deadly Force Was Not Objectively Reasonable Under the Totality of the Circumstances

Defendants' actions were not objectively reasonable because: (1) when the Deputies shot and killed John Brown, most of the *Graham* and *Jacobs* factors justifying the use of deadly force

9

were not present; (2) there are genuine issues of material fact regarding what John and the Defendants did prior to the shooting, which bear directly on the reasonableness of Deputy Blanchard's belief that he was in imminent danger; (3) Defendants recklessly and unreasonably created the perceived need to use deadly force because they knew John was an EDP and they did not handle him as such; (4) under the *Garner* balancing test, John's fundamental and vital interest in his own life outweighed any interest the Defendants had in attempting to forcibly disarm and shoot him; and (5) issues of causation and reasonableness are for the jury.

1. **Most of the *Graham* and *Jacobs* factors justifying the use of deadly force were not present**

The Fourth Amendment test is an objective one that considers the totality of the circumstances. *Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir. 2000). To determine whether an officer's use of deadly force was reasonable, courts consider several factors, referred to here as "the *Graham* and *Jacobs* factors." *Id.* Those factors include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (*quoting Graham v. Connor*, 490 U.S. 386, 396 (U.S.N.C. 1989)). Courts also consider "whether the citizen was under arrest or suspected of committing a crime" or whether the citizen "was interfering or attempting to interfere with the officer's execution of his or her duties." *Id.* (*citing McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir.1992)). Ultimately, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed – to the community or to the arresting officers – *if left unattended*." *Jacobs,* 215 F.3d at 773 (emphasis added).

In *Jacobs*, the plaintiff was "sitting in his apartment alone behind a locked door" when defendant police officers broke down the door, entered his apartment without warning, and

10

pointed a gun at his head. *Id.* at 773. The police officers detained the plaintiff for three hours while they looked searched his apartment for cocaine. *Id.* The Seventh Circuit held that the police officers' used excessive force in violation of the plaintiff's Fourth Amendment rights and not entitled to qualified immunity. *Id.* at 774. The court reasoned that:

> Under existing Seventh Circuit and Supreme Court precedent at the time the use of force occurred in this case, it appears to be clearly unreasonable for the [d]efendant [o]fficers to have pointed a loaded weapon at [the plaintiff] for an extended period of time when they allegedly had no reason to suspect that he was a dangerous criminal, or indeed that he had committed any crime at all, [plaintiff] was unarmed, and when [plaintiff] had done nothing either to attempt to evade the officers or to interfere with the execution of their duties.

*Id.* at 774.

Based off of the *Jacobs* and *Graham* factors outlined above, the use of force to be employed against John, if any, should have been very low. Like the officers in *Jacobs*, at the time the Deputies kicked in John's door and pointed a gun at him, the Deputies "had no reason to suspect that [John] was a dangerous criminal" or that he "committed any crime at all." *Id.* at 774. Suicide is not a crime in Wisconsin. Defendants were dispatched to the Brown residence to help John as part of a "rescue squad" and not to effectuate an arrest or stop a crime. (Facts 110.) During the encounter with Defendants, John was neither resisting arrest nor attempting to evade arrest, as the Deputies never informed John he was under arrest, nor did they have reason to arrest him. (Facts 43-69.) When the Deputies kicked in John's bedroom door, he was sitting at his desk with his back towards the Deputies. (Facts 46.) During the entire encounter, at no point did John threaten the Deputies, his mother, or anyone else for that matter. (Facts 43-69.) Therefore, like the court in *Jacobs*, this Court should also find that Deputy Blanchard's use of deadly force was unreasonable and that he is not entitled to qualified immunity.

### a. **The Fourth Amendment reasonableness test considers the totality of the circumstances, including what the Deputies knew prior to the shooting**

11

Despite Defendants' contentions, when applying the reasonableness test and considering the totality of the circumstances, courts must assess "all of the events that occurred around the time of the shooting." *Deering v. Reich,* 183 F.3d 645, 649 (7th Cir.1999). As the Seventh Circuit explained:

> Reasonableness depends on the information the officer possesses prior to and at the immediate time of the shooting; the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted . . . After all, *we can only assume police do not approach the arrest of a jaywalker and a cop killer in the same fashion.*

*Id.* at 650 (internal quotations and citations omitted).

Prior to arriving at the residence, Deputies Blanchard and Such were informed that John was crying over a girl, he was bi-polar and off his meds, he was locked in his room alone cutting himself, his mother was the only other person in the house, and he likely had no other weapons except the knife he used to cut himself. (Facts 111-18.)

In addition to the information they heard, Deputy Such actually knew John from a prior incident. (Facts 120.) Deputy Such did a favor for him one night by driving him into Burlington from his house. (Facts 120.) On the night of the shooting, Deputy Such even told Ms. Brown that John was a polite young man. (Facts 121.) Given the information the Deputies possessed prior to the shooting, they should have approached the situation more like they would handle a "jaywalker" instead of a "cop killer." *Deering,* 183 F.3d at 649.

When Defendants arrived at the residence, John was still locked inside his room. (Facts 23.) At that time, Defendants had no reason to believe John posed a threat to them, his mother (the only other person in his home), or that he intended to leave his home and thereby potentially pose a danger to the public. Despite their prior knowledge regarding John's condition and having been called as part of a "rescue team," Deputies Blanchard and Such approached the

12

situation as if they were attempting to make an arrest or stop a crime. Within minutes of arriving at the residence, Deputy Blanchard kicked in John's door. (Facts 40, 43.) John was sitting at his desk with his back towards the Deputies. (Facts 46.) A vulnerable and depressed John allegedly stood up, said nothing, and closed the door shut with his left hand. (Facts 57.) During this part of the exchange, at no point did John threaten the Deputies, his mother, or anyone else for that matter. (Facts 43-69.) There was no "immediate threat to the safety of the officers or others." *Graham v. Connor*, 490 U.S. 386, 396 (U.S.N.C. 1989)). Moreover, under Wisconsin law, officers are specifically prohibited from using deadly force to prevent suicide, and the Wisconsin DOJ makes note of this in its law enforcement training manuals. Wis. Stat. Ann. § 939.48(2)(5) (West); (Facts 142.)

After John slammed the door shut, Defendants did not discuss less-aggressive options in how to handle John, such as attempting to negotiate with him or asking his mother to talk John down through the outside window or door. (Facts 58.) Instead, Deputy Blanchard continued to approach the situation aggressively, kicking in John's bedroom door a second time and shooting him in the neck moments later. (Facts 40, 58, 126.)

Based on the *Jacobs* and *Graham* factors, Defendants' use of deadly force was objectively unreasonable under the circumstances. The "force used to seize [John] was [clearly] excessive in relation to the danger he posed – to the community or to the arresting officers – *if left unattended*." *Jacobs,* 215 F.3d at 773 (emphasis added). Accordingly, this Court must deny the Defendants' Motion.

### 2. There are genuine issues of material fact regarding what John Brown and Defendants did prior to the shooting, which bear directly on the reasonableness of Deputy Blanchard's belief that he was in imminent danger

Deputy Blanchard's primary argument is that his use of deadly force was justified at the

time of the shooting because John placed him and Deputy Such in imminent danger of death or serious bodily harm. (Def.s' Motion for SJ, p. 14.) Deputy Blanchard claims that John provoked the shooting by refusing to comply with his orders to show his hands and by stating "you're going to have to fucking shoot me." (Def.s' Motion for SJ, p. 20.) Defendants also stated that John "moved the knife in an upward position and advanced towards Deputy Blanchard," who was only five to six feet away. (Def.s' Mot. for SJ, p. 14.)

Based off of John Brown's testimony, there are clear discrepancies between her version of the events leading up to the moment John was shot and the version submitted by the Deputies. (Facts 40, 143.) The Deputies claim that they ordered John to show his hands several times; however, Ms. Brown, who was able to hear everything "loud and clear," did not report hearing those commands. (Facts 40, 143.) The Deputies also reported that they gave John time and opportunity to drop his knife and surrender; however, Ms. Brown said the Deputies hastily kicked in John's bedroom door and fired shots "directly after" that. (Facts 40.)

Accordingly, Defendants' Motion must be denied because there are material "disputes about what [John Brown] did prior to the shooting, and such dispute[s] bears directly on the reasonableness of [Deputy Blanchard's] belief that he was in imminent danger." *Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 960 (E.D. Wis. 2003). As this Court has held, in a Fourth Amendment excessive force claim, it "cannot on a motion for summary judgment decide whose version of events is more credible." *Id.*

**B. Defendants recklessly and unreasonably created the perceived need to use deadly force because they knew John was an emotionally disturbed person and did not handle him as such**

**1. Deputies Blanchard and Such's actions were reckless and precipitated the need to use deadly force**

In addition, Defendants' use of deadly force was particularly unreasonable in light of the

14

fact that the Defendants knew John was emotionally disturbed at the time of the incident. As discussed above, the Fourth Amendment reasonableness test considers the totality of the circumstances, including whether the Deputies recklessly and unreasonably created the perceived need to use deadly force. *See, e.g.*, *Deorle v. Rutherford*, 272 F.3d 1272, 1282 n. 20 (9th Cir. 2001) (holding that the court must consider whether police employed any tactic that "needlessly or unreasonably creates a dangerous situation necessitating an escalation in the use of force").

In *Allen v. Muskogee, Okl.*, after fighting with his wife and children, the suicidal plaintiff took a gun and ammunition and parked in front of his sister's house. 119 F.3d 837, 839 (10th Cir. 1997). Police officers reporting to the scene were informed that the plaintiff was suicidal, armed, had threatened family members, and had an outstanding warrant for arrest for impersonating an officer. *Id.* While swarming the plaintiff's car, one officer attempted to enter through the passenger door, shots were exchanged, and the plaintiff was killed. *Id.* In reversing the district court's grant of summary judgment, the court held that there "a reasonable jury could conclude on the basis of some of the testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841. The court reasoned that there were issues of material fact because:

> [S]ome deposition testimony indicates that [the officer] ran "screaming" up to [plaintiff's] car and immediately began shouting at [plaintiff] to get out of his car; other testimony indicates that [the officer] approached cautiously and tried talking [plaintiff] into giving up the gun.

*Id.*

The plaintiff's conduct in *Allen* was far more dangerous than John Brown's conduct. Johndid not have a gun nor was he in a position to harm the public, as he was locked in his bedroom by himself. (Facts 36.) Moreover, the arriving officer's in *Allen* were told to expect a farm more dangerous situation than Deputies Blanchard and Such. While the officers in *Allen*

15

were told that the plaintiff was armed, threatening other people, and had an outstanding warrant for an arrest, Deputies Blanchard and Such were simply told that Mr. Brown was crying over a girl, locked in his room alone cutting himself, his mother was the only other person in the house, he likely had no other weapons except the knife he used to cut himself. (Facts 109-18.) Therefore, like the court in *Allen*, this court should also hold that "a reasonable jury could conclude on the basis of some of the testimony presented that the [Defendants'] actions were reckless and precipitated the need to use deadly force." 119 F.3d at 841.

## 2. John Brown was an EDP and should have been handled as such

As this Court has recognized, in assessing the reasonableness of a police officer's actions, it is also important to consider whether the police officer "knew or should have known that [a] plaintiff was mentally ill and, if so, whether [the officer] followed generally accepted police practices applicable to encounters with such persons." *Buchanan*, 290 F. Supp. 2d at 961. The Seventh Circuit and its sister Circuits has similarly held that an officer's knowledge of a suspect's emotionally disturbed status is an important factor in determining whether an officer's tactics and level of force used were reasonable. *See, e.g.*, *Palmquist v. Selvik,* 111 F.3d 1332, 1340-41 (7th Cir.1997) (indicating that an officer's awareness of an emotionally disturbed person's suicidal motivation has a bearing on what tactics and level of force are reasonable); *Ludwig v. Anderson,* 54 F.3d 465, 472 (8th Cir.1995) (same).

This Court's opinion in *Buchanan* is instructive as to how Deputies Blanchard and Such should have acted when dealing with Mr. Brown the night he was killed and highlights precisely why the Deputies' conduct was unreasonable under those circumstances. 290 F. Supp. 2d at 961. In that case, the plaintiff had a history of mental illness and alcohol abuse, and was experiencing severe mood swings, anxiety, and thoughts of suicide. *Id.* at 957. On the night at issue, he

Case 2:13-cv-00511-LA   Filed 02/28/14   Page 16 of 30   Document 28

verbally threatened and abused his mother and then attacked both of his roommates, hitting one over the head with a pickle jar and throwing a flower pot at the other. *Id.* The plaintiff then pulled a butcher knife from his waistband and stated that he intended to cut his own wrists or throat. *Id.* Police officers responding to the scene were informed that "a battery was in progress," the suspect had a weapon, and the plaintiff was holding one of his roommates hostage. *Id.*

When the officers arrived at the scene, the plaintiff "emerged from his apartment with the knife in hand," refused orders to drop the knife, and then yelled "you're going to have to shoot me in the head – I won't drop the knife." *Id.* at 958. After being shot at (but not hit), the plaintiff stood out on his balcony where he was about ten feet from the officers. *Id.* One of the officers shot at plaintiff again, hitting him in the stomach. *Id.* The officer justified his actions by stating that he feared for his life because the plaintiff "made the sign of the cross with his knife, closed one eye as if he were taking aim and raised the knife to the right side of his head." *Id.* The plaintiff, who survived, disputed the officer's version of events, alleging that he turned the blade inward toward his own stomach. *Id.*

This Court held that because "a reasonable factfinder could conclude that [the officer] knew or should have known that plaintiff was emotionally disturbed and could take this fact into account when assessing the constitutional reasonableness of his use of force," the officer's motion for summary judgment on the excessive force claim must be denied. *Id.* at 961-62. The Court approached its analysis in three parts. *Id.*

### a. Defendants knew John was an EDP

First, this Court considered whether or not the officer knew or should have known the plaintiff was an EDP. *Id.* It answered this question in the affirmative, stating that the officer

likely was told the plaintiff was mentally ill from the dispatcher or the plaintiff's roommate. *Id.*

Moreover, even if the officer was not told the plaintiff was an EDP, he could infer this

conclusion based on his own observations of the plaintiff and the fact that he was suicidal. *Id.*

The Court explained:

> When [the officer] ordered him to drop the knife, plaintiff pressed the blade
> against his chest as if he was going to stab himself and said that [the officer]
> would have to shoot him to get him to drop the knife. This behavior was
> extremely irrational. Plaintiff had done nothing to warrant a lengthy prison
> sentence (he was ultimately convicted of two misdemeanors); thus, his conduct
> was obviously compelled by his own inner demons. Moreover, police officers are
> trained to recognize people suffering from serious emotional or mental problems.
> Michael Avery, *Unreasonable Seizures of Unreasonable People; Defining the
> Totality of Circumstances Relevant to Assessing the Police Use of Force Against
> Emotionally Disturbed People,* 34 Col. Hum. Rts. L.Rev. 261, 332 (2003).

*Id.* at 961 (emphasis added).

### b. Why police officers must use different tactics with EDPs

Next, this Court explained why police officers needed to use different tactics when

dealing with EDPs:

> A great deal of information has long been available to police officers concerning
> how to interact with persons who are emotionally disturbed. *Id.* at 290–91. These
> materials uniformly indicate that emotionally disturbed persons often respond
> slowly or inappropriately to police orders, and that officers' usual techniques for
> eliciting compliance from criminal suspects are not likely to work with such
> persons. *Id.* at 292–93. Emotionally disturbed people are already fearful, and
> threats or forceful verbal commands usually make matters worse by making them
> still more frightened. *Id.* at 292–94.

*Id.*

### c. The tactics and force Defendants should have used on John

Finally, this Court highlighted the tactics and level of force the officer should have used:

> Police training materials consistently recommend that officers can greatly reduce
> the dangers present in encounters with emotionally disturbed persons by adhering
> to a few simple principles including: (1) keeping a safe distance from the person;
> (2) avoiding unnecessary and provocative displays or threats of force; (3) making
> it clear to the person that the police want to help him, and that the way to

18

accomplish this is for the person to put down the weapon and come to the police for help; and (4) taking as much time as necessary to talk the person into custody even if it runs into hours or more. James J. Fyfe, *Policing the Emotionally Disturbed*, 28 J. Am. Acad. Psychiatry & L. 345, 347 (2000).

*Id.* at 961-62.

Unlike the officers in *Buchanan*, Deputies Blanchard and Such were both expressly told by a police dispatcher that John Brown was suicidal, bi-polar and off his medications, crying over a girl, and drunk. (Facts 109-18.) There was no issue whether or not the Deputies knew John was an EDP, as each of these conditions (alone) indicates a person is an EDP. (Facts 109-18-18.) Accordingly, the Deputies should have followed the well-established procedures for handling EDPs outlined in *Buchanan*, in the Wisconsin DOJ's "Crisis Management" and "Defense and Arrest Tactics" standards and training manuals, and presumably Walworth County Sheriff Department's own similar policies regarding EDPs.[1] (Facts 127-43.)

In their Motion, Deputies Blanchard and Such have argued that they had to use deadly force because John put them in imminent danger of death or serious bodily harm. (Def.s' Motion for SJ, p. 14.) They allege that they did not have opportunity "to maintain a safe distance from John while attempting to defuse the situation" because his bedroom was located in an "extremely narrow 2.6 foot hallway." (Def.s' Motion for SJ, p. 14.)

Defendants should not have been outside the doorway at that time and should have approached the situation with more patience and thought. Prior to the shooting, Deputy Such could clearly see John inside his room and radioed John's movements to Deputy Blanchard as he watched him from an outside window. (Facts 36.) At this point in time, given that John was an EDP, the Deputies should have kept a safe distance, avoided unnecessary and provocative

---

[1] At this point in time, Plaintiff has not received any information regarding what policies and procedures Walworth County Sheriff's Department has for how police officers should handle suicidal, emotionally disturbed, and/or intoxicated persons. Discovery is ongoing. However, Defendants have acknowledged that at least some of their

19

displays of force, made it clear they were trying to help him, and taken "as much time as necessary to talk the person into custody even if it runs into hours or more." *Buchanan,* 290 F. Supp. 2d at 961. Instead, the Deputies did the opposite.

Within minutes of arriving, Deputy Blanchard hastily kicked in John Brown's door twice, made provocative threats of force, and put himself within five to six feet of an EDP, who he knew was not cooperating with his demands at the time. (Facts 40, 125.) Deputy Blanchard's actions constituted unnecessary and reckless conduct that escalated the situation and the perceived need for force. Nothing is more illustrative of this point than the fact that John was shot and killed within five minutes of Deputy Blanchard's arrival.

Federal courts have found similar types of conduct unreasonable. *See, e.g., Alexander v. City and County of San Francisco,* 29 F.3d 1355 (9th Cir. 1994) (remanding for trial plaintiff's claim that force was unreasonable under all the circumstances where officers allegedly stormed house of mentally ill, half-blind recluse who had threatened to shoot anyone who entered).

**C. Under the *Garner* balancing test, John's fundamental and vital interest in his own life outweighed any interest the Defendants had in attempting to forcibly disarm and/or shoot John Brown**

Finally, when determining whether the Defendants' use of deadly force was reasonable, courts must balance "the nature and quality of the intrusion on [John's] Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Deering v. Reich*, 183 F.3d 645, 650-51 (7th Cir. 1999) (*quoting United States v. Place,* 462 U.S. 696, 703 (1983)). In the balancing, "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." *Id.*

Here, the nature and quality of Defendants' intrusion on John's Fourth Amendment

_____

policies and procedures were adopted from the Wisconsin DOJ's Law Enforcement Standards and Training Board. (Facts 112.)

interests is unparalleled, as there is no higher interest than the interest one has in the preservation and well-being of his own life. *See Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 960 (E.D. Wis. 2003) (*quoting Garner,* 471 U.S. at 9). Because the use of deadly force is an "unmatched" intrusion on a person's Fourth Amendment rights, courts have placed firm, concrete limits on the use of deadly force. *See, e.g.*, *Garner*, 471 U.S. 1, 9.

In *Garner*, the Supreme Court explains how courts must balance the individual's interest in his own life against the government's interest in effective law enforcement and keeping the peace. *Id.* The argument is that to effectively make arrests, police officers must be able to resort to the use of deadly force, or the meaningful threat thereof. *Id.* The hope is that "overall violence will be reduced by encouraging the peaceful submission of suspects [to a crime] who know they may get shot if they flee." *Id.* at 9-10. *Garner* explains not only the circumstances where police officers can use deadly force, but also highlights how those justifications are not applicable under the facts of this case. *Id.* at 9.

In that case, a young man suspected of burglarizing a house was shot and killed by a police officer after continuing to flee after being told to "halt." *Id.* at 1. At the time, Tennessee had a statute that permitted police officers to "use all necessary means to effect [an] arrest" if they give a criminal suspect notice of an intent to arrest him and the suspect flees or forcibly resists. *Id.* Balancing the competing interests, the Supreme Court held that it was unconstitutional and unreasonable for a police officer to shoot a non-dangerous fleeing suspect under the circumstances, even if he was a felon. *Id.* at 11. The Court reasoned that the vital interest the suspect has in his own life outweighed the police officer's interest in shooting him, noting that "[i]t is not better that all felony suspects die than that they escape." *Id.*

The primary justification for permitting police officers to use deadly force is that it is a

necessary means to effectively make arrests and stop crimes. As discussed above, unlike the suspect in *Garne*r, John Brown was not committing a crime, was never told he was under arrest, and was not fleeing from the police. This was precisely one of those circumstances where "it is not better that [John] die than that [he] escape [or be left alone]." *Garner*, 471 U.S. at 9.

### D. Issues of reasonableness and causation are for the jury

In sum, when considering the totality of the circumstances, Defendants acted unconstitutionally and unreasonably when they used deadly force against John Brown. Moreover, because reasonable minds could differ regarding whether Defendants were in imminent harm and acted reasonably during their encounter with John Brown, the jury should decide the issue. Courts have been particularly wary of granting summary judgment to officers in cases where, as here, the victim has died. *See, e.g., Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) *(quoting Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir. 1994)) ("[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict history - the person shot dead - is unable to testify."). Even where all officers present have consistent and justifiable accounts of the use of force, an expert witness report alone may be enough evidence to warrant denial of summary judgment. *See, e.g., La v. Hayducka,* 269 F. Supp. 2d 566, 581 (D.N.J. 2003) (although both officers consistently stated that an emotionally disturbed man "lunged" at them, "the Court proceeds with caution" due to decedent's inability to testify). Accordingly, based on the above, Defendants Motion for Summary Judgment must be denied.

### II. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Under the qualified immunity doctrine, once a plaintiff demonstrates that the facts establish a violation of a constitutional right, the issue is whether the right claimed was clearly

established at the time of the incident. *Buchanan,* 290 F. Supp. 2d at 962 (*citing Saucier v. Katz,* 533 U.S. 194 (2001)). Where there are disputed issues of fact, qualified immunity must be rejected, unless the plaintiff's facts fail to demonstrate an established constitutional violation. *Curley v. Klem,* 298 F.3d 271, 282 (3d Cir. 2002).

In this case, the specific issue is whether the right to be free from the use of deadly force where a suspect did not "pose[] an immediate threat to the safety of the officers or others" was clearly established as a matter of Fourth Amendment law at the time of this incident. *Graham,* 490 U.S. at 396. Viewing the facts in the light most favorable to John, Defendants cannot claim that they were not on fair notice of the right asserted. As this Court has stated, "[i]t [has] clearly [been] established . . . that the excessive use of force during an arrest or other seizure constitute[s] a Fourth Amendment violation . . . and that the use of deadly force [is] permissible only when the officer reasonably believe[s] that the suspect pose[s] an immediate threat to the officer or others." *Buchanan,* 290 F. Supp. 2d at 962 (*citing Titran v. Ackman,* 893 F.2d 145, 146 (7th Cir.1990). Moreover, because Defendants' argument is based on disputed factual issues, it must be rejected. *Id.* (*citing Garvin v. Wheeler,* 304 F.3d 628, 633–34 (7th Cir.2002)) (stating that "[t]he Seventh Circuit has consistently held that if further factual development is necessary to determine whether [an] officer is entitled to qualified immunity," summary judgment must be rejected).

Federal courts have consistently rejected claims of qualified immunity in Fourth Amendment deadly force contexts where they have first found that the facts establish a Fourth Amendment violation. *See, e.g.*, *Meadours v. Ermel,* 483 F.3d 417, 423 (5th Cir. 2007) (factual disputes preclude summary judgment on qualified immunity argument where, under plaintiff's version of the facts, emotionally disturbed suspect did not pose an immediate threat to officers);

*Bennnett v. Murphy,* 120 Fed. Appx. 918 (3d Cir. 2005) (no qualified immunity where officers

shot armed EDP who did not point shotgun at anyone but himself).  Accordingly, Defendants'

Motion for Summary Judgment must be denied.

## III.  DEPUTY SUCH IS LIABLE BECAUSE HE FAILED TO INTERVENE AND PREVENT DEPUTY BLANCHARD FROM USING EXCESSIVE FORCE

Although Deputy Such did not pull the trigger that killed John Brown, he is not absolved

of all constitutional liability because he stood by and failed to intervene when he had the

opportunity to prevent Deputy Blanchard from using excessive force.  Under Section 1983, an

officer who is present and fails to intervene to prevent other law enforcement officers from

infringing the constitutional rights of citizens is liable "if that officer had reason to know: (1) that

excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any

constitutional violation has been committed by a law enforcement official; *and* the officer had a

realistic opportunity to intervene to prevent the harm from occurring."  *Yang v. Hardin*, 37 F.3d

282, 285 (7th Cir. 1994) (citations omitted).  Defendants also cite to *Yang* in support of their

motion.  (Def.s' Motion for SJ, p. 20.)  In *Yang*, however, the Seventh Circuit overturned the

district court's judgment in favor of the defendant offer, holding that the district court's finding

that the officer did not have a reasonable time to intervene or a reasonable likelihood of

successful intervention was "clearly erroneous."  *Yang*, 37 F.3d at 285.

A realistic opportunity to intervene may exist whenever an officer could have called for

backup, called for help, or at least cautioned the offending officer to stop.  *Abdullahi v. City of

Madison*, 423 F.3d 763, 774 (7th Cir. 2005).  Pointedly, the Seventh Circuit has made clear that

the prongs of analyzing a failure to intervene claim almost always implicate questions of fact for

the jury: "Whether an officer had sufficient time to intervene or was capable of preventing the

harm caused by the other officer is generally an issue for the trier of fact unless, considering all

the evidence, a reasonable jury *could not possibly conclude otherwise*." *Id*. at 774 (*citing*

*Lanigan v. Village of East Hazel Crest Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)) (emphasis added).

In *Abdullahi*, the Court reversed summary judgment on plaintiff's failure to intervene claim,

stating that although it was a close call, "given that the excessive force claim against [the officer]

is not amenable to summary judgment, the associated failure to intervene claims must go to trial

as well." *Id.* at 774.

Here, Deputy Such was standing right behind Deputy Blanchard when John was shot and,

therefore, a factual dispute exists as to whether Deputy Such had a realistic opportunity to

intervene to prevent Deputy Blanchard from shooting John. (Facts 61.) Accordingly, because

Deputy Blanchard is not entitled to summary judgment or qualified immunity, Plaintiff's claims

against Deputy Such should also be decided by a jury.

## IV.     WALWORTH COUNTY IS NOT ENTITLED TO SUMMARY JUDGMENT

### A.  Walworth County's Failure to Train their Police Officers in Handling EDPs Subjects them to Section 1983 Liability

To establish a city's liability under Section 1983 for inadequate training of police officers

in the use of force, a plaintiff must show (1) the officers exceeded constitutional limitations on

the use of force; (2) the use of force arose under circumstances that constitute a usual and

recurring situation with which police officers must deal; (3) the inadequate training demonstrates

a deliberate indifference on the part of the city toward persons with whom the police officers

come into contact, and (4) there is a direct causal link between the constitutional deprivation and

the inadequate training.  *Allen*, 119 F.3d at 841-42 (*citing City of Canton, Ohio v. Harris*, 489

U.S. 378, 387 (1989)).  Despite Defendants' contention, "a showing of specific incidents which

establish a pattern of constitutional violations is not necessary to put [Walworth County] on

notice that its training program is inadequate." *Id.*  Evidence of a single violation of federal

rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability. *Id.* at 844; *Canton,* 489 U.S. at 390 n. 10.

Here, as discussed above, Deputies Blanchard and Such used excessive force in violation of the Fourth Amendment. Therefore, only the second, third and fourth elements are at issue.

### 1. It is almost certain that Walworth County police officers would have to deal with EDPs

Ms. Brown can establish that Defendants use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal. In *Buchanan*, this Court already recognized that it was inevitable police officers would encounter EDPs while on the job. 290 F. Supp. 2d at 962. Other federal courts have recognized the same. *See, e.g.*, *Allen*, 119 F.3d 837, 841-42. The article cited to in *Buchanan*, Michael Avery's *Unreasonable Seizures of Unreasonable People*: *Defining the Totality of Circumstances Relevant to Assessing the Police Use of Force Against Emotionally Disturbed People*, 34 Col. Hum. Rts. L.Rev. 261, 332 (2003), speaks directly to this point:

> The need for training with respect to encounters with emotionally disturbed people is as compelling as the need to train with respect to constitutional limits on the use of deadly force that the [Supreme] Court recognized in *City of Canton*. As has been discussed above, the frequency with which officers encounter such persons is very high. The risks of mishandling such incidents are also very high, frequently involving the use of deadly force.

*Id.* Moreover, even Wisconsin DOJ's training guides, which have been adopted in part by Walworth County, have recognized that "it is very likely [police officers] will encounter and respond to people with some form of serious and persistent mental illness," such a bipolar disorder. (Facts 137.) Accordingly, Ms. Brown can establish the second element.

Case 2:13-cv-00511-LA   Filed 02/28/14   Page 26 of 30   Document 28

## 2. Walworth County's inadequate training demonstrates a deliberate indifference on the part of the city towards EDPs with whom the police officers come into contact

Ms. Brown can also establish that Walworth County's inadequate training demonstrates a deliberate indifference on the part of the city towards EDPs with whom the police officers will inevitably come into contact. As one court explained, the third element is met when:

> It may happen in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious and the inadequacies so likely to result* in a violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Allen*, 119 F.3d 837, 841-4 (*quoting Canton*, 49 US at 390). For example, because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and because the city has armed its officers with firearms to accomplish this task, "the need to train officers in the constitutional limitations on the use of deadly force, can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (*quoting Canton*, 49 US at 390). Similarly, as discussed above, it is almost inevitable that police officers will encounter EDPs. It is also well-established in the law enforcement community that EDPs must be handled differently than regular suspects, as they "often respond slowly or inappropriately to police orders, and that officers' usual techniques for eliciting compliance from criminal suspects are not likely to work with such persons." *Buchanan*, 290 F. Supp. 2d at 961. EDPs "are already fearful, and threats or forceful verbal commands usually make matters worse by making them still more frightened." *Id.*

Courts have held that if a city does not have separate police policies and training for how to handle EDPs, such failure could properly be characterized as "deliberate indifference" to the

constitutional rights of EDPs. *See, e.g.*, *Allen*, 119 F.3d 837, 841-4 (reversing district court's grant of summary judgment because, when viewed in a light most favorable to the plaintiff, "the record supports an inference that the [c]ity trained its officers to leave cover and approach armed suicidal, emotionally disturbed persons and to try to disarm them, a practice contrary to proper police procedures and tactical principles"). Courts have noted that it can be significant if there is a police practice expert's testimony that the officers involved improperly handled the EDPs, which was proof of inadequate training on the part of the defendant county, is relevant. *Id.*

Here, Walworth County alleges that Deputies Blanchard and Such followed proper procedures when they encountered John Brown, a known EDP. In their Motion and Statement of Facts, Defendants only provide policies and training that relate to handling regular suspects, and no separate policies for how to handle EDPs. (Facts 79-91.) Accordingly, because Walworth County does not have any separate police policies and procedures for how to handle EDPs,[2] such a failure constitutes a deliberate indifference on the part of Walworth County towards EDPs with whom the police officers will encounter.

### 3. There is a direct causal link between the constitutional deprivation and the inadequate training

Finally, Ms. Brown can establish the fourth element, that there is a direct causal link between the constitutional deprivation and the inadequate training. If a plaintiff presents evidence that a certain police department policy or lack thereof unnecessarily created a situation to escalate resulting in the plaintiff's alleged constitutional violation, *i.e.*, the deputies' excessive use of force, than the fourth element is satisfied. *Allen*, 119 F.3d at 844. For example, in *Allen*, the plaintiff's expert testified that approaching and trying to grab a gun a suicidal EDP "created a high risk of death for officers, the armed person, and other civilians, and was reckless." *Id.* The

---

[2] At this point in time, none have been disclosed. However, discovery is ongoing.

court held that this was sufficient to establish a causal link between the officers' training and the alleged constitutional deprivation." *Id.*

Like in *Allen*, there is plenty of evidence provided by numerous sources, including plaintiff's police procedures expert, Dr. Alpert, sources referenced in *Buchanan*, and the Wisconsin DOJ's law enforcement training manuals, that police officers will unnecessarily escalate a situation with an EDP if they approach them aggressively and in a rush. (Facts.127-43.) Accordingly, there is a clear causal link between Walworth County's inadequate EDP training and policies, and the excessive force used by Deputies Blanchard and Such which violated John Brown's constitutional rights. In sum, Ms. Brown can establish her failure to train claim against Walworth County and, therefore, summary judgment must be denied.

### B. Walworth County Sherriff's Department Policy, Practice and Custom

To recover against Walworth County on this similar claim, Ms. Brown must demonstrate that a County policy or custom caused the deprivation of John Brown's constitutional rights. *Cornfield by Lewis v. Consolidated High School Dist. No. 230,* 991 F.2d 1316 (7th Cir.1993). Here, even if Walworth County did have proper EDP procedures, the existence of such procedures alone does not insulate a municipality when its policies and customs allow rights deprivations. *See, e.g.*, *Daskalea v. District of Columbia,* 227 F.3d 433,442 (D.C. Cir. 2000) (holding that a policy prohibiting sexual harassment will not insulate the municipality from liability where there is evidence the city was indifferent to its violation). Nor does the existence of some training relieve Walworth County of liability. *See, e.g.*, *Russo v. City of Cincinnati,* 953 F.2d 1036,1047 (6th Cir. 1992) (holding that city did not escape liability for failure to train on interacting with people with mental illness by having a course entitled "Disturbed-Distressed Persons" and having a policy on the books for handling barricaded persons, where a man with

29

paranoid schizophrenia wielding a knife was shot 22 times by police officers after a police radio broadcast that he was, "suicidal, homicidal, and a hazard to police"). Accordingly, Walworth County's Motion for Summary Judgment must be denied. *See Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990) (citations omitted) (holding that the issue of "whether the plaintiff has demonstrated[d] a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue" is almost always a jury question). *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir. 1990) (citations omitted).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment must be denied in its entirety.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC

By: ___/s_ Antonio M Romanucci_____
Attorney for Plaintiff

Antonio M. Romanucci
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark St., Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004