# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**NANCY BROWN, individually and as
Special Administrator for the Estate of
JOHN BROWN, Deceased,**
        **Plaintiff,**

    v.                                                  Case No. 13-C-0511

**WAYNE BLANCHARD,
CHRISTOPHER SUCH, and
WALWORTH COUNTY, WISCONSIN**
        **Defendants.**

## DECISION AND ORDER

Nancy Brown, on behalf of the estate of her son, John Brown, seeks relief under 42 U.S.C. § 1983 against Walworth County, Wisconsin, and two of its deputy sheriffs. Before me now is the defendants' motion for summary judgment.

### I. BACKGROUND

Late in the evening of May 4, 2012, John Brown, who was 22 years old, locked himself in the bedroom of the mobile home he shared with his mother, Nancy. He was intoxicated and contemplating suicide. He left phone messages for friends in which he stated, among other things, that he would be looking down from heaven soon and that he "just wanted it to be done." He also sent text messages to friends that indicated he was contemplating suicide. He informed one of his friends, Mindy Hamm, that he had been cutting himself, that there was blood everywhere, and that he was "ending it tonight."

At around midnight, Hamm called Brown's mother and told her that Brown was in his bedroom and that he was hurting himself. Brown's mother was in another part of the

mobile home, and she immediately hung up the phone and rushed to Brown's bedroom. The door to Brown's bedroom was locked, but Brown's mother had a key and unlocked the door. When Brown's mother unlocked the door, she saw Brown sitting at his computer desk. She noticed that he was crying, that he was holding a knife, and that he was bleeding from his wrist. She rushed over to Brown and attempted to take the knife out of his hand. When she asked Brown to let go of the knife, he refused. Brown's mother held his head in her arms and told him she was going for help. When she stated that she was going to call the police, Brown said "okay Mom." When Brown's mother left the room to call 911, Brown closed the door and locked it again.

Brown's mother called 911 and told the dispatcher that her 22-year-old son was cutting his wrists with a knife and trying to commit suicide. She told the dispatcher that Brown had cut himself in the past, that he was bipolar, and that he refused to take his medication. She also informed the dispatcher that Brown had been drinking heavily and that there were no other weapons in the room besides the knife. The dispatcher told Brown's mother that the police were on their way.

Deputies Wayne Blanchard and Christopher Such separately responded to the 911 call. While en route, the dispatcher informed them that an intoxicated male subject had locked himself in his bedroom and was cutting himself with a knife. The dispatcher also informed them that Brown was suicidal, that he was bipolar but refused to take medication, and that Brown's mother had stated that there were no weapons in the room besides the knife.

Deputy Such was the first to arrive at the mobile home. He entered and spoke with Brown's mother, who told him that Brown had locked himself in the bedroom and was

2

cutting himself with a knife. The bedroom was located at the end of a hallway that was 2.6 feet wide. Such walked down the hallway and stood next to the closed door. He could hear loud music playing from Brown's room. He identified himself to Brown through the closed door. At first, Brown did not respond. Such then asked Brown if he remembered him from a prior encounter in which Such had given him a ride to a nearby city. According to Such, Brown responded by saying "fuck you." According to Brown's mother, Brown did not respond in this manner.

Deputy Blanchard arrived a few minutes after Such. Blanchard spoke with Brown's mother, who told him what she had told Such. Blanchard then spoke with Such, who informed Blanchard that he had tried to speak with Brown through the closed door but that Brown had responded in a negative manner. Brown's mother asked the deputies to help her son.

Blanchard removed his gun from his holster and walked to the bedroom door. Around this time, Such went outside and looked through Brown's bedroom window. Such radioed to Blanchard that he could see into Brown's room, that Brown was sitting at a computer desk with his back towards the bedroom door, that he was conscious, and that he was smoking a cigarette and drinking a beer.

Brown's mother approached Blanchard and gave him a key to the bedroom door. Blanchard gave the key back to her, stating that he intended to kick the door in. According to Blanchard, he decided to kick the door in rather than use a key because he did not want to alert Brown that he was attempting to open the door. Blanchard was concerned that if Brown learned that Blanchard was opening the door, Brown might attempt to access other

3

weapons that may have been in the room. After trying to give Blanchard the key, Brown's mother walked back to the living room and sat down on the sofa.

The deputies and Brown's mother disagree on what happened after this point. According to the deputies, Blanchard kicked the bedroom door open and took a step back to position himself in the hallway. When Such saw through the bedroom window that the bedroom door was open, he ran back into the mobile home and positioned himself behind Blanchard. The deputies observed Brown sitting at his computer desk with his back to them. Blanchard ordered Brown to show his hands. Brown ignored the order and briefly glanced at Blanchard. Blanchard again ordered Brown to show his hands, and again Brown ignored the order. Brown then stood up and turned toward the deputies in what they describe as a "Frankenstein-like" manner. The deputies observed blood on Brown's left arm and that he was holding a folding knife with what appeared to be a five-inch blade in his right hand. Brown proceeded to give the deputies what they describe as a "thousand-yard stare." Before Blanchard could say anything else, Brown walked to the bedroom door and slammed it closed with his left hand.

Blanchard immediately kicked the door back open. At that point, Blanchard was still in the hallway, just outside the doorframe, and Such was directly behind him. Brown was standing in his bedroom, halfway between the doorframe and the desk. Blanchard pointed his gun at Brown and ordered him to drop the knife. Brown stared at Blanchard and then told Blanchard he would have to shoot him. Brown then "rolled his shoulders forward," started moving the knife "in an upward position" towards Blanchard, and started advancing toward Blanchard. When Brown came within five or six feet of the deputies, Blanchard fired two shots at Brown. Brown was shot in the neck and killed.

4

Brown's mother tells a slightly different version of the events immediately prior to the shooting. Although she could not see everything that was happening from her position on the couch, she could hear what was happening. She did not hear Blanchard order Brown to drop the knife, but she did hear one of the deputies call his name twice. She heard Brown say something like "fine, come in and shoot me between the eyes and kill me," but according to her Brown said this before Blanchard kicked open the door, in response to Blanchard's informing Brown that he intended to kick the door in. Brown's mother then heard the door being kicked in, slammed again, kicked in a second time, and then she heard the two gunshots.

In the present lawsuit, Brown's mother claims that Deputy Blanchard's actions, which resulted in her son's death, constituted an unreasonable seizure in violation of the Fourth Amendment. She also claims that Deputy Such failed to intervene to prevent Blanchard from shooting Brown. Finally, she claims that Walworth County is liable for Brown's injuries because it failed to train its deputy sheriffs on how to respond to suicide calls. The defendants move for summary judgment on all three of these claims.

## II. DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

## A. Claim for Unreasonable Seizure Against Blanchard

The Fourth Amendment protects persons against unreasonable searches and seizures. All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop or other "seizure" of a citizen who is not in custody are analyzed under the Fourth Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Whether a particular seizure is reasonable depends upon the totality of the circumstances. Tennessee v. Garner, 471 U.S. 1, 8–9 (1985). In the present case, Blanchard contends that his seizing Brown by shooting him was reasonable because, at the time Blanchard fired the shots, he reasonably believed that Brown was advancing on him and Deputy Such with the knife and intended to cause serious physical harm. See id. at 11 (stating that it is reasonable to use deadly force during a seizure if the officer has probable cause to believe that the person being seized poses a threat of serious physical harm, either to the officer or to others).

An initial question is whether there is a genuine factual dispute over whether the deputies reasonably thought that Brown was advancing on them with an upraised knife. Each deputy has submitted an affidavit stating that Brown was advancing on them in this fashion. The plaintiff has not submitted any evidence that directly contradicts the deputies' affidavits on this point. Of course, that is because Brown is dead and cannot relate his version of what happened. However, Brown's mother was in the next room and could hear what was going on at the time of the shooting. Although she could not see whether Brown raised his knife and advanced on the deputies and therefore cannot directly contradict the deputies' affidavits on this point, her testimony provides reasons to question the deputies' version of what happened. First, although the deputies claim that Blanchard ordered

6

Brown to drop the knife, Brown's mother never heard them give such an order. Second, Brown's mother's testimony conflicts with the deputies' claim that after Blanchard kicked in the door the second time Brown gave him a "thousand-yard stare" and said "you're going to have to fucking shoot me." According to Brown's mother, Brown did say "fine, come in and shoot me," but he said this in response to Blanchard's informing Brown that he was going to kick in the door the first time. Moreover, Brown's mother states that she heard the shots immediately after she heard the door being kicked in a second time, see Brown Dep. at 49, ECF No. 25-1, and thus a jury could reasonably question whether enough time passed to allow Brown to give Blanchard a thousand-yard stare, tell him he would have to shoot him, and then advance on the deputies.

In general, a non-movant cannot avoid summary judgment by claiming that the finder of fact could disbelieve the testimony of the movant's witnesses. Muhammed v. City of Chicago, 316 F.3d 680, 683–84 (7th Cir. 2002). However, when the non-movant points to "specific evidence" that can be used to attack the credibility of the movant's witnesses, "such as contradictory eyewitness accounts or other impeachment evidence," a dispute over credibility can defeat summary judgment. Id. Here, the plaintiff has specific evidence that calls the deputies' credibility into question—namely, Brown's mother's testimony about what happened in the moments prior to the shooting. Although Brown's mother cannot testify as to whether Brown actually threatened the deputies with the knife, the differences between her testimony and the deputies' testimony on other matters, such as whether the deputies told Brown to drop the knife and when Brown told the deputies to shoot him, might cause the jury to question whether the deputies are being truthful about what actually happened during the confrontation. If the jury decides that the deputies are not being

7

truthful about certain matters concerning the shooting, they may choose to disbelieve other parts of their testimony about what happened during the shooting, including their claim that Brown advanced on them with an upraised knife. See United States v. Edwards, 581 F.3d 604, 612 (7th Cir. 2009) (trier of fact may consider whether falsehoods in witness's testimony so undermine his credibility as to warrant disbelieving the rest of his testimony or a crucial part of such testimony). Thus, whether Blanchard reasonably perceived that Brown was threatening the deputies' safety by raising the knife and advancing on them is a question for the jury to resolve.

However, even if Blanchard establishes that he reasonably thought Brown was advancing on the deputies with an upraised knife, a question would remain as to whether Blanchard unreasonably seized Brown. In assessing whether a police shooting is reasonable, the totality of the circumstances is not "limited to the precise moment when [the officer] discharged his weapon." Deering v. Reich, 183 F.3d 645, 649 (7th Cir.1999). Rather, a court must assess "all of the events that occurred around the time of the shooting." Id. at 652. The actions of the police officer that led to the shooting are relevant. Estate of Starks v. Enyart, 5 F.3d 230, 233–34 (7th Cir.1993). An officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct. Id. at 234; accord Catlin v. City of Wheaton, 574 F.3d 361, 369 n.7 (7th Cir. 2009); Sledd v. Lindsay, 102 F.3d 282, 287–88 (7th Cir. 1996); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1366 (9th Cir. 1994); see also Allen v. Muskogee, 119 F.3d 837, 840 (10th Cir. 1997) (holding that officer is liable for excessive force if his or her own "reckless or deliberate conduct during the seizure

unreasonably created the need to use such force"); Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995) (same).

Here, a reasonable jury could conclude that Blanchard "unreasonably created the encounter that led to the use of force." Sledd, 102 F.3d at 288. Blanchard knew that Brown was suicidal and bipolar, that he had been drinking, and that he had a knife. He also knew that, if left alone, Brown could not have harmed anyone other than himself, as Brown was the only person in the bedroom. Thus, Blanchard's only legitimate ground for initiating a seizure of Brown was to prevent him from harming himself. Yet, it is hard to see how Blanchard's actions—kicking in the door, ordering Brown to show his hands and drop the knife, and pointing his gun at Brown—were reasonably calculated to achieve this end. Since Brown was contemplating suicide, he was unlikely to obey the deputy's commands to surrender. Moreover, a reasonable officer would have known that there is a high likelihood that a suicidal person will respond to an officer's show of force with an action that is likely to provoke the officer to use deadly force, as the person may wish to commit "suicide by cop." See Wis. DOJ Law Enforcement Standards Board, Crisis Management: A Training Guide for Law Enforcement Officers 66 (2007); ECF No. 29-1 (hereinafter "Crisis Management Guidelines").[1] In light of these risks, Blanchard needed to have a

---

[1]The Crisis Management Guidelines state with respect to armed subjects contemplating suicide:

> A particular concern in this regard is a subject who is apparently trying to commit "suicide by cop"—that is, acting in such a way as to force the police to kill him or her, rather than committing suicide himself or herself. For example, a suicidal man with a gun may ignore orders to drop the weapon, and instead point it at responding officers. Now it is a deadly force situation, and the subject's goal may be to have police respond with deadly force. The person is using the police as the agents of his death rather than pulling the

compelling reason to enter Brown's bedroom with his gun drawn. Yet, in his affidavit, Blanchard never explains why he decided to "force entry into Mr. Brown's bedroom." Blanchard Aff. ¶ 24, ECF No. 26. To be sure, he explains why he decided to kick the door open rather than unlock it, but he does not explain why he decided to enter the bedroom in the first place. He never explains what he hoped to accomplish once he was inside. Did he plan on ordering Brown to surrender and hoping that he would comply, or did he have a more reasonable goal in mind? Why didn't Blanchard simply continue to allow Such to monitor Brown through the window and either continue talking to Brown through the door or wait for him to calm down? If Such saw that Brown was using the knife to commit suicide, then at that point Blanchard could have broken into the room and tried to help him. At the time Blanchard decided to enter, however, there was no indication that Brown had the knife hovering over his wrists or was otherwise on the verge of committing suicide. Rather, Such had just informed Blanchard that Brown "was sitting at his computer desk with his back towards the bedroom door, and that he was smoking a cigarette and drinking

---

trigger himself.

> A specific scenario in this regard is an armed subject who is barricaded in a house and threatening suicide. Such a subject may or may not want the police to kill him. Again, proper response depends on the situation. If the subject has other people with him, perhaps as hostages, then there has to be some response to try to ensure the safety of those other people. In such a case, hostage negotiators will likely be called to try to resolve the situation. If a subject is apparently alone, however, the tactical response decision may be different. Some law enforcement agencies have adopted a "hands off" policy in such cases. They choose not to respond so as to avoid forcing a possible deadly force "suicide by cop" situation. That is, they simply do not provide the subject with the opportunity that he wants for others to kill him.

Crisis Management Guidelines at 66–67.

a beer." Such Aff. ¶ 19. In short, absent some reasonable explanation for Blanchard's entering the bedroom almost immediately after arriving on the scene and creating a situation in which the need to use deadly force would be likely, it is impossible to conclude that Blanchard's conduct during the seizure was reasonable. Accordingly, Blanchard may have violated the Fourth Amendment even if, at the time he fired the shots, Brown was threatening to seriously harm the deputies.[2]

Blanchard contends that even if his conduct violated the Fourth Amendment he is entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. 194, 206 (2001). For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to

---

[2]Of course, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97. But as noted in the text, the circumstances facing Blanchard did not call for a split-second judgment, as Such was observing Brown and did not see him do anything indicating that immediate entry into the room was required.

say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks and citation omitted).

In the present case, I have identified two different factual scenarios under which Blanchard could be deemed to have unreasonably seized Brown: (1) using deadly force against Brown without probable cause to believe that Brown was threatening the deputies with serious physical harm; and (2) unreasonably creating the encounter that led to Brown's threatening the deputies with serious physical harm. Under the first factual scenario, Blanchard is not entitled to qualified immunity because it is clearly established that an officer may not use deadly force to seize a subject who is not threatening the safety of the officer or anyone else. Garner, 471 U.S. at 9–12. Under the second factual scenario, Blanchard is not entitled to qualified immunity because it is clearly established that an officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct. Catlin, 574 F.3d at 369 n.7; Sledd v. Lindsay, 102 F.3d at 287–88; Estate of Starks, 5 F.3d at 234. Although no case precisely identifies Blanchard's conduct in the second scenario as the kind of "unreasonable conduct" that creates a dangerous situation, I conclude that it would have been obvious to a reasonable officer in Blanchard's position that his or her course of conduct was unlawful despite the absence of a case saying as much. See Hope, 536 U.S. at 741 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"). My conclusion is based on the obvious unreasonableness of Blanchard's conduct: in light of Such's observations of Brown through the bedroom window, there was no reason for Blanchard to immediately enter the room with his gun drawn and create a situation calling for the need to use deadly force. A specific case

identifying this conduct as unreasonable is not needed to give the officer fair notice that the conduct is unlawful.

Accordingly, Blanchard is not entitled to summary judgment.

**B.      Claim for Failure to Intervene Against Such**

An officer who is present and fails to intervene to prevent other law-enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring. Yang v. Hardin, 37 F.3d 282, 285 (7th Cir. 1994).

In the present case, the plaintiff argues that Such should have intervened to prevent Blanchard from unjustifiably shooting Brown.[3] However, the plaintiff has not pointed to evidence in the record from which the jury could reasonably conclude that Such knew that Blanchard was about to shoot Brown without probable cause to believe that Brown was threatening the deputies with serious physical harm. The only evidence that plaintiff cites is the deputies' testimony that Such was standing right behind Blanchard when Brown was shot. See Br. in Opp. at 25, ECF No. 28. But the most this evidence shows is that had Such known that Blanchard was about to shoot Brown without probable cause to believe that he was threatening the deputies with serious physical harm, he might have been able

---

[3]The plaintiff does not argue that Such should have intervened to prevent Blanchard from unreasonably precipitating the need to use deadly force. See Br. in Opp. at 25, ECF No. 28. Moreover, it is hard to see how Such could have intervened at that point, since when Blanchard decided to kick in the door Such was outside the mobile home. Such did not reenter the home until after he saw through the window that the bedroom door was open. Such Aff. ¶¶ 19–20.

13

to prevent him from doing so. It does not suggest that Such in fact knew that Blanchard was about to shoot Brown without probable cause to believe that Brown was threatening the deputies with serious physical harm, and that he passed up an opportunity to prevent Blanchard from shooting. Accordingly, Such is entitled to summary judgment.

**C.      Claim for Municipal Liability Against Walworth County**

Under Monell v. Department of Social Services, 436 U.S. 658, 690 (1978), municipalities and other local governmental units are "among those persons to whom § 1983 applies." However, a municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. Rather, municipal governments are liable only when their officers inflict an injury in the execution of the government's policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694.

Under certain circumstances, a municipality's failure to train its officers can amount to a municipal policy and form the basis for liability under § 1983. City of Canton v. Harris, 489 U.S. 378, 387 (1989). A municipality will be held liable under a failure-to-train theory only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact. Id. at 388; Jenkins v. Bartlett, 487 F.3d 482, 492 (7th Cir. 2007). This may arise in either of two circumstances. First, "a municipality acts with deliberate indifference when, 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' that the deficiency exhibits deliberate indifference on the part of municipal policymakers." Jenkins, 487 F.3d

14

at 492 (quoting City of Canton, 489 U.S. at 390). Alternatively, a court may find deliberate indifference "when a repeated pattern of constitutional violations makes 'the need for further training . . . plainly obvious to the city policymakers.'" Id. (quoting City of Canton, 489 U.S. at 390 n. 10). Besides showing that the failure to train constitutes deliberate indifference, the plaintiff must demonstrate a "causal connection" between the inadequate training and his or her injury. See, e.g., Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 675 (7th Cir. 2012).

In the present case, the question presented in connection with plaintiff's claim against Walworth County is whether the County's failure to provide its deputy sheriffs with training on how to respond to suicide calls amounted to deliberate indifference to the constitutional rights of the individuals with whom the deputies come into contact. The evidence does not indicate that there has been any pattern of constitutional violations involving the rights of suicidal persons in Walworth County, and so the question is whether the need for training on how to respond to a suicide call without committing constitutional violations (including unreasonable seizures) is so obvious that the County's failure to provide such training amounts to deliberate indifference.

A reasonable jury could conclude that the County knew "to a moral certainty" that its sheriff's deputies would be required to respond to suicide calls. City of Canton, 489 U.S. at 390 n.10. As the Wisconsin Crisis Management Guidelines explain, "[l]aw enforcement officers often have to deal with suicidal people," including in the context of a call about a person who is armed and threatening suicide. Crisis Management Guidelines at 58, ECF No. 29-1. Further, a reasonable jury could conclude that it is obvious that training is needed to ensure that deputies do not unnecessarily precipitate the need to use

15

deadly force during an encounter with a suicidal person. The Crisis Management Guidelines devote an entire chapter to the topic of how to handle suicidal persons, id. at 58–73, and this supports the conclusion that law-enforcement officers need at least some training on what to do when responding to a suicide call. Finally, as far as the present record reveals, Walworth County provides its deputies with no training whatsoever on the proper handling of suicide calls. Thus, the jury could reasonably conclude that Walworth County has failed to adequately train its sheriff's deputies on the proper handling of suicidal persons, and that in doing so it was deliberately indifferent to the risk that constitutional violations would result.

The County points out that the Seventh Circuit has held that a failure to provide special training to officers on the proper use of force against "people who appear to be crazy" is not deliberate indifference, at least in the absence of a pattern of constitutional violations that could have been prevented by special training. See Pena v. Leombruni, 200 F.3d 1031, 1033–34 (7th Cir. 1999). But in Pena, the question was whether special training was needed on the use of force against a crazy person who appeared to be threatening a law-enforcement officer with serious physical harm. The Seventh Circuit held that the municipality's general training on the proper use of force "covered the case of the crazy assailant, giving him all the protection to which constitutional law entitled him." Id. at 1033. In the present case, the question is not whether Walworth County should have given its deputies special training on when it was permissible to use deadly force against a person who appears to be suicidal. It is whether the County should have given its deputies training on how to avoid unreasonably creating the need to use deadly force

against a suicidal person in the first place.  Pena is not instructive on this latter question and thus does not foreclose the plaintiff from pursuing a failure-to-train claim at trial.

Finally, a reasonable jury could find a causal connection between Walworth County's failure to train its deputies on how to respond to suicide calls and the plaintiff's injury.  Had Blanchard received some training on strategies for approaching suicidal persons, such as those mentioned in the Crisis Management Guidelines, he might not have unnecessarily rushed into Brown's room with his gun drawn and unreasonably precipitated a deadly confrontation with Brown.

Accordingly, Walworth County is not entitled to summary judgment.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted as to Such and denied as to Blanchard and Walworth County.

Dated at Milwaukee, Wisconsin, this 17th day of July, 2014.

                            s/ Lynn Adelman
                            _____
                            LYNN ADELMAN
                            District Judge